In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 11-3006 & 11-3018

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

SAMANTHA JOHNSON and TRACI GRAY,

*Defendants-Appellants*.

Appeals from the United States District Court for the
Western District of Wisconsin.
Nos. 3:11-cr-13-bbc-2 & 3:11-cr-13-bbc-1 — **Barbara B. Crabb**, *Judge*.

ARGUED JUNE 1, 2012 — DECIDED SEPTEMBER 6, 2013

Before FLAUM, ROVNER, and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. Like many other couples, Traci Gray and Vince Anderson wanted to buy a home for their family. With the help of Gray's friend, Samantha Johnson, and the assistance of a shady mortgage broker, Gray and Anderson were able to obtain a loan to finance their home purchase—albeit with a falsified loan application. Several years after they bought the home, a jury convicted Gray and

Johnson on charges of mortgage fraud and conspiring to commit mortgage fraud.

On appeal, Gray and Johnson argue that the government failed to present sufficient evidence to prove they conspired to commit mortgage fraud beyond a reasonable doubt. But we think the jury had enough evidence to conclude that Gray and Johnson conspired with their mortgage broker to submit a loan application that included statements they knew to be false in order to influence the lender's decision. Gray and Johnson also contend that the district court abused its discretion by denying them the opportunity to present testimony from other borrowers to show their mortgage broker's history of duping his clients. Because the broker's prior wrongdoing was not very probative of Gray's and Johnson's guilt, the district court acted within its discretion when it granted the government's motion in limine to exclude testimony from other borrowers about the broker's interactions with them. We affirm.

## I. BACKGROUND

In 2006, Gray, a legal secretary, and Anderson, her boyfriend, decided to purchase a $322,000 home in Prairie du Sac, Wisconsin. They planned to live in the home with their children, with Anderson paying half the mortgage. Gray sought financing with the assistance of Brian Bowling, a mortgage broker who owned a company called Platinum Concepts. Due to Anderson's bad credit, however, the couple did not qualify for financing. Gray then tried to qualify with her brother, but they too were unsuccessful.

On October 3, Gray's friend Samantha Johnson sent Gray an email offering to be her co-borrower, under the condition

that Gray provide her with a written promise that she would only be on the loan as a co-borrower for two years. (Johnson received a finder's fee from Shannon Barman, who was the general contractor, the daughter of the builder/seller, and Johnson's childhood friend.) Gray forwarded the email to Bowling and asked whether Johnson could apply for the loan with her as a non-occupant borrower. Bowling, who believed the arrangement was feasible, informed Gray that she could now qualify for a *non-occupant*, stated-income loan. After reviewing the proposed terms of that loan, however, Gray decided against applying because the monthly payment was too high. Bowling then offered an *owner-occupy*, stated-income loan for her and Johnson. Although the owner-occupy loan required Gray and Johnson to obtain a larger second mortgage to finance their home purchase, they decided to go ahead and apply anyway. Bowling sent their application to Fremont Investment & Loan, a federally insured lender who specialized in stated-income loans, also known as "liars' loans" because the lender typically did not verify the financial information supplied by applicants for such financing. *See United States v. Phillips*, Nos. 11-3822 & 11-3824, 2013 U.S. App. LEXIS 18430, at *4 (7th Cir. Sept. 4, 2013) (en banc).[1]

---

[1] A recent *en banc* decision dealt with another instance of alleged mortgage fraud involving the same dishonest mortgage broker from this case. *See Phillips*, 2013 U.S. App. LEXIS 18430, at *2-4. The appellants in *Phillips* challenged the exclusion of testimony regarding statements their broker made to them concerning the meaning of certain terms in the mortgage application and the importance that the lender would attach to certain information in their application. *See id*. at *9-13. A majority of this court found this exclusion to be erroneous. *Id*. at *21-22. Gray and Johnson (continued)

Bowling testified that, at some point prior to the closing, he had a telephone conversation with both Johnson and Gray to review the information he supplied in their final loan application. According to Bowling, he told both women that they would be listed as occupants of the property, that their incomes would be inflated, and what the monthly payment for the loan would be. Bowling did this to avoid any possibility that Johnson and Gray would be surprised by the application information or the loan terms and refuse to go forward with the closing.

Shortly before the closing, Bowling held an in-person meeting at his office with Gray, Johnson, builder/seller Dick Hinrichs, and Barman to review the terms of the proposed owner-occupy loan and to discuss the need for a second mortgage from Hinrichs. Although Hinrichs initially balked at the second mortgage because its terms required him to lend more than he expected, he ultimately relented and even agreed to forgive $32,000 of the $48,000 second mortgage. The parties signed the second mortgage that evening and forward-dated it to November 16, the date of the closing.

Gray, Johnson, Bowling, Hinrichs, Barman, and the closing agent all attended the closing. Gray and Johnson initialed every page of the final loan application and signed it in four places, including once above a written notice that it is

---

have not raised such an argument here. Instead, their appeal challenges the sufficiency of the evidence to sustain the conspiracy verdict and the exclusion of extrinsic evidence related to their broker's prior bad acts in preparing fraudulent loan documents for other clients. Given the differences in the claims raised in each case, we do not rely on *Phillips* in deciding this appeal.

a federal crime to knowingly make a false statement on a loan application. The closing proceeded without incident, and Gray and Johnson received a $273,700 mortgage from Fremont and, at least on paper, a $48,300 second mortgage from the seller.

Gray and Johnson acknowledge that the final loan application which they initialed and signed contained a number of false statements. Among other untrue assertions, both Gray and Johnson stated that they: earned a combined $11,000 per month; would live in the home together as their primary residence; would make the mortgage payments together; and would have a second mortgage with the seller for $48,300 to cover the difference between the purchase price of the home and the mortgage they received from Fremont. In reality, Gray and Johnson had a combined monthly income of approximately $5,000, Johnson would not be living in the home or contributing to the mortgage, and the seller forgave $32,000 of the $48,300 second mortgage before the closing.

Mortgage broker Bowling became the subject of a federal investigation into his involvement in mortgage fraud. Sentenced to fifty-one months' imprisonment, he agreed to testify against Gray, Johnson, and other clients, in hopes of having his sentence reduced. At Gray's and Johnson's June 2011 trial, Bowling testified about the scheme to falsify the loan documents, his discussions with Gray and Johnson regarding the false information he included in the loan application, and a meeting where the parties discussed the details of the scheme. He could not, however, remember the dates of these interactions.

On cross examination, Bowling admitted to submitting false loan applications, inflating applicants' income, exaggerating assets, understating liabilities, falsifying job titles and employment histories, misrepresenting the sources of down payments, and engaging in silent second mortgages. Counsel also impeached Bowling with specific instances of untruthful conduct including forging signatures on loan documents.

The government called several other witnesses, including Anderson, Hinrichs, the general contractor, and the closing agent. Anderson testified that Johnson did not live at the home or contribute to the mortgage and that the plan was to have her on the loan for two years until he could improve his credit score. The closing agent testified that with Gray and Johnson she would have followed her standard practice at closing, which is to review each document with the buyer, provide a brief overview, and allow the buyers time to read the document if they so choose.

Neither Gray nor Johnson testified. They called a few witnesses, including two former loan officers who worked for Bowling and who testified that he was not a truthful person by reputation or in their personal opinion.

The jury convicted Gray and Johnson on both counts, and the court sentenced Gray to two months' imprisonment and Johnson to one day of confinement. The court also ordered both women to pay $66,377 in restitution. Gray and Johnson appeal, challenging the sufficiency of the evidence for the conspiracy count and the district court's decision to exclude extrinsic evidence of Bowling's history of duping innocent borrowers.

## II. ANALYSIS

### A. Sufficient Evidence to Support Gray's and Johnson's Conspiracy Convictions

Gray and Johnson first argue that the evidence before the jury was insufficient to sustain a conviction on the conspiracy count. A defendant challenging a jury verdict must demonstrate that no reasonable jury could have reached the same verdict. *United States v. Farris*, 532 F.3d 615, 618 (7th Cir. 2008). We will "overturn a conviction based on insufficient evidence only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Hills*, 618 F.3d 619, 637 (7th Cir. 2010).

Under 18 U.S.C. § 1014, it is a crime to "knowingly make[] any false statement or report … for the purpose of influencing in any way the action of" a federally insured institution. To satisfy its burden of showing that the appellants engaged in a conspiracy to violate § 1014, the government must prove that (1) the conspiracy charged in the indictment existed; (2) each defendant knowingly became a member of the conspiracy with an intention to further the conspiracy; and (3) a member of the conspiracy committed an overt act in furtherance of the conspiracy. *United States v. Lee*, 558 F.3d 638, 645 (7th Cir. 2009).

The government's evidence was sufficient to support the jury's verdict. First, Bowling's testimony that he brokered the loan at issue, that he reviewed the false statements he made in the final loan application with Gray and Johnson prior to

the closing, and that Gray and Johnson agreed to those falsi-
ties to obtain the desired loan strongly support the existence
of the conspiracy to knowingly make false representations to
influence the lender's decision. The government also pre-
sented evidence that both Gray and Johnson knowingly par-
ticipated in the conspiracy. Bowling testified that he, Gray,
Johnson, and Hinrichs met before the closing to discuss the
terms of the owner-occupy loan and the second mortgage
from Hinrichs. He also testified that Gray turned down the
non-occupant borrower loan (in favor of the owner-occupant
loan) because the monthly payments were too high. In addi-
tion to Bowling's testimony, the government introduced the
October 3 email from Johnson to Gray in which Johnson of-
fered to be on the loan for two years and which Gray then
forwarded to Bowling. The government also offered into ev-
idence the final loan application, which included the false
statements and Gray's and Johnson's initials and signatures.
Finally, the government proved overt acts in furtherance of
the conspiracy with the October 3 email and the signed and
submitted false loan application. A reasonable jury could
have found Gray and Johnson guilty of conspiracy based on
this evidence.

On appeal, Gray and Johnson contend that they never
reviewed the falsified loan application and that Bowling's
testimony to the contrary is not credible. Without that testi-
mony, Gray and Johnson argue, the government's evidence
of conspiracy is insufficient. This argument is unpersuasive.

To the extent the jury credited Bowling's testimony, we
will only set that credibility determination aside if the testi-
mony is "exceedingly improbable." *United States v. Smith*,
576 F.3d 681, 687 (7th Cir. 2009) (internal quotation marks

and citations omitted). Exceedingly improbable testimony is that which is "internally inconsistent or implausible on its face." *United States v. Cardona-Rivera*, 904 F.2d 1149, 1152 (7th Cir. 1990).

Gray and Johnson repeatedly characterize Bowling's testimony as "internally inconsistent." This characterization is inaccurate. A fairer representation of Bowling's testimony would be "imprecise." For example, Bowling admitted that he could not recall the dates of a key meeting and phone conversations with Gray and Johnson. But he consistently testified that the meeting and phone calls occurred, and Gray and Johnson presented no evidence to the contrary. Bowling's inability to recall dates does not make his testimony internally inconsistent.

Gray and Johnson also argue that Bowling's testimony is improbable because the government failed to introduce evidence confirming the phone calls between Bowling and the Defendants. According to their reasoning, since the government did not introduce evidence corroborating the phone calls, they must not have happened. But the jury was not required to make the same leap in logic.

Key documents and other witnesses corroborated many portions of Bowling's testimony as to Gray's and Johnson's involvement in the conspiracy. The most important piece of evidence was the loan application containing numerous false statements which Gray and Johnson initialed and signed in the presence of Bowling and others at the closing. The October 3 email showed the terms of the actual agreement between Gray and Johnson in writing. And Gray's boyfriend testified that Johnson did not live with the couple and that they planned to replace Johnson on the loan within two

years. Both Hinrichs and Barman testified that they met with Gray, Johnson, and Bowling at Bowling's office shortly before the closing to discuss the loan and the second mortgage from Hinrichs. Furthermore, the evidence before the jury showed that Gray and her boyfriend found the home, that Gray recruited other potential co-borrowers, and that Johnson reached out to Gray and received a finder's fee.

Gray and Johnson emphasize Bowling's lack of credibility, pointing specifically to his admission of illegal activity. The jury was aware of Bowling's fraud and dishonesty, and defense counsel impeached him on specific instances of untruthful conduct. That the jury credited his testimony in spite of his history is not grounds for overturning the jury's verdict. *See, e.g., United States v. Wilson*, 31 F.3d 510, 514 (7th Cir. 1994) (holding that evidence will not be considered incredible as a matter of law even if "totally uncorroborated and comes from an admitted liar, convicted felon, large-scale drug dealing, paid government informant").

### B. Excluding Extrinsic Evidence of Bowling's Dealings with Other Borrowers Was Not an Abuse of Discretion

Before trial, the government filed a motion in limine to preclude Gray and Johnson from introducing extrinsic evidence that Bowling prepared false loan applications for other borrowers who were not aware that he was doing so. The court granted the motion, explaining that Gray and Johnson could cross-examine Bowling about his prior bad acts and whether he duped other borrowers but under Federal Rule of Evidence 608(b), they could not prove those prior bad acts with extrinsic evidence—namely, the testimony of borrowers duped by Bowling. The district court also rejected Gray's

and Johnson's argument that such testimony would be admissible under Rule 404(b). Gray and Johnson challenge that decision, arguing that the court's refusal to allow them to introduce evidence of Bowling's past dealings with unsuspecting borrowers prevented them from negating one of the key elements of the government's case: that they knowingly participated in the conspiracy.

"We review a district court's decision to admit or exclude evidence for abuse of discretion." *United States v. Boros*, 668 F.3d 901, 907 (7th Cir. 2012). Federal Rule of Evidence 404(b) generally prohibits "[e]vidence of a crime, wrong, or other act … to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." That rule allows such evidence in limited situations, namely to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

A defendant can "introduce evidence of a government witness's prior bad acts if that evidence tends to negate the defendant's guilt." *United States v. Sanders*, 708 F.3d 976, 992 (7th Cir. 2013). When a defendant seeks to admit this "non-defendant" or "reverse" 404(b) evidence, "a district court should balance the evidence's probative value under Rule 401 against considerations such as prejudice, undue waste of time[,] and confusion of the issues under Rule 403." *United States v. Reed*, 259 F.3d 631, 634 (7th Cir. 2001); *see also United States v. Seals*, 419 F.3d 600, 606 (7th Cir. 2005). We have noted that in most cases "the only serious objection to [reverse 404(b)] evidence is that its probative value is slight, as it may just amount to pointing a finger at someone else who, having a criminal record, *might* have committed the crime the

defendant is accused of committing." *United States v. Murray*, 474 F.3d 938, 939 (7th Cir. 2007).

The district court did not abuse its discretion in excluding extrinsic evidence of Bowling's prior instances of falsifying loan documents without the applicants' knowledge. The probative value of the reverse 404(b) evidence here was slight. Whether Bowling had a pattern and practice of preparing fraudulent loan applications that defrauded both lenders and borrowers was not the issue in this trial. The district court acted within its discretion when it determined that allowing extrinsic evidence to prove Bowling's prior bad acts would distract jurors from the issue at hand—whether Gray and Johnson knew that the documents they initialed and signed contained false statements. *See United States v. Alayeto*, 628 F.3d 917, 922 (7th Cir. 2010) (affirming exclusion of reverse 404(b) evidence in light of "danger that the jurors would be distracted from the central issue in the case— [defendant]'s intent—by prolonged discussions of [accomplice]'s post-arrest activities"). Even if Bowling had a history of duping borrowers, Gray and Johnson still could have willingly conspired with him to submit their falsified application. Their knowledge—not his history—was what the jury needed to determine. *See, e.g., id.* (affirming trial court's exclusion of instances in which accomplice convinced other drug mules to transport drugs when "contested evidence may have demonstrated [accomplice's] intent to deliver the narcotics, but it would not have been significantly probative of [defendant]'s intent").

Furthermore, the district court was within its discretion in excluding this extrinsic evidence because Bowling's testimony made the jury well aware of his capacity for defraud-

ing others without their knowledge. On cross-examination, Bowling admitted to committing a number of acts of mortgage fraud over the years, including falsifying income values, forging signatures, and mischaracterizing the occupancy status of applicants. Although Bowling never testified that he did these things without the applicants' knowledge, the jury was still aware that Bowling had previously made material misrepresentations to lenders and the lenders had no idea Bowling lied to them. In light of the jury's awareness of Bowling's nature as a serial fraudster, the extrinsic evidence Gray and Johnson sought to introduce would have added little to the jury's understanding of Bowling's involvement in the mortgage fraud conspiracy.

## III. CONCLUSION

For the reasons set forth above, we AFFIRM the judgment of the district court.