In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1015

JEREMY VENSON,

*Plaintiff-Appellant,*

*v.*

LAZARO ALTAMIRANO, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 08 C 6682 — **Rubén Castillo**, *Chief Judge.*

ARGUED NOVEMBER 26, 2012 — DECIDED APRIL 18, 2014

Before ROVNER, WILLIAMS, and TINDER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Chicago police officers arrested Jeremy Venson in 2007 for possession of a controlled substance and solicitation of an unlawful act, and he spent 19 days in jail. After a preliminary hearing resulted in the dismissal of the charges for want of probable cause, Venson sued the three officers involved in his arrest—Lazaro Altamirano, Christopher Jania, and John O'Keefe—for false arrest, illegal search,

and malicious prosecution pursuant to 42 U.S.C. § 1983. The case was tried to a jury, which found in favor of the defendants. Venson appeals, and we affirm.

**I.**

Venson, then eighteen years old, was arrested on November 2, 2007, near the intersection of 13th and Keeler Streets in the North Lawndale neighborhood of Chicago. According to the defendant officers, Venson was hawking cocaine on the street to passers-by. Venson maintains his innocence, denying the acts that the officers say identified him as a drug dealer. At trial, the parties gave divergent accounts of the events leading up to Venson's arrest. With a jury verdict in their favor, the defendants are entitled to a favorable interpretation of the evidence as we entertain such questions as whether the verdict was against the manifest weight of the evidence. *See Barber v. City of Chicago*, 725 F.3d 702, 705 (7th Cir. 2013). But because the parties' competing accounts of what occurred have a bearing on a number of the issues Venson has raised on appeal, we set forth both accounts, *see id.*, beginning with that of the defendants.

The officers testified that they were on patrol in the North Lawndale neighborhood in the late morning of November 2, driving northbound on Kedvale. As they approached the intersection of 13th Street, they heard someone yelling "Rocks, rocks." Tr. 147. They saw Venson standing approximately 300 feet away, at the intersection of 13th and Keeler, yelling; Venson was facing partially, but not completely, away from the officers. Altamirano and O'Keefe saw a car driving through the intersection while Venson was shouting.

Their suspicions aroused, the officers steered their car toward Venson, proceeding against the designated direction of traffic on 13th Street, which is a one-way street. Venson saw them coming as they approached and began walking toward their unmarked Crown Victoria. In the middle of the block, the officers stopped their car, alighted from the vehicle, and instructed Venson to "come here" or "hold up," or words to that effect. Tr. 209.

When he was about five to seven feet away from the officers, Venson opened his hand and dropped a small green-tinted baggie to the ground. Jania picked it up from the sidewalk as Altamirano patted down Venson's person. After inspecting the packet and concluding that it contained what looked like cocaine, Jania so advised the other two officers by using the code "57," Tr. 229, and they placed Venson under arrest. A more thorough search of his clothing produced $52 but nothing else of note. The officers drove Venson to the police station, where he was booked on charges of possessing a controlled substance, *see* 720 Ill. Comp. Stat. 570/402(c), and soliciting unlawful business, *see* Chicago Municipal Code § 10-8-515.

Venson told a different story. He testified that he began walking to his girlfriend's house at approximately 11:30 in the morning on November 2. The two had plans to see a movie; his mother had given him $53 the night before for that purpose. The intersection of 13th and Keeler did not lay on a direct path between Venson's home and his girlfriend's house. Venson explained that he had walked nearly a mile out of his way to a convenience store that carried a particular flavor of AriZona brand tea beverage (watermelon) that he liked. After purchas-

ing the drink, he proceeded south on Keeler toward his girlfriend's house.

As he approached 13th street, the officers drove past him, gave him "a real nasty look,"Tr. 52, then stopped and backed up. They exited their car and one of the officers, speaking to Venson, said "Hey you, come here." Tr. 53. Venson walked to the middle of the street to meet the officers, raising his hands as he did so. The officers grabbed him, threw him hard against the hood of their vehicle, placed him in handcuffs, asked him what his name was, and demanded of him, "What are you doing? Where's the shit? Give us the shit now." Tr. 56. Venson told them he didn't have anything, which the officers said was "bullshit." Tr. 56. Venson pleaded ignorance, explaining that he was on his way to meet his girlfriend. The officers proceeded to search Venson's person (including his genital area and buttocks) and confiscated his cell phone and money. They demanded that Venson doff his shoes, and then the officers removed his socks, turned them inside-out, and threw them into the street. They found no drugs or other contraband on his person. But the officers continued to pepper him with questions about drugs and guns, demanding that he give them information. "We're not just going to let you go. You got to give us something. You help us out and we'll help you out." Tr. 61–62. Venson demurred, insisting that he was simply on his way to his girlfriend's house.

Next, Venson said, he was thrown into the back of the police car while the officers used the computer in their car to run a check on him. The officers continued to press him for information about drugs and guns, and proceeded to drive Venson around "K-town"—an area so named for the many

streets beginning with the letter K—pointing at people and gesturing to make it appear as if Venson was conversing with them. They told Venson, "Well, you might as well give us something now 'cause everybody going to know you're a snitch." Tr. 65–66. O'Keefe, according to Venson, took a small bag of drugs from his pocket, waved it in Venson's face, and threatened to frame him if he did not cooperate. A terrified Venson continued to insist he had nothing to tell the officers.

The officers eventually took him to the police station after driving him around the neighborhood for another 10 to 20 minutes. During that time, Venson, as he had from the outset of the encounter, begged them to loosen his handcuffs, which were too tight, but they refused.

What happened next is undisputed. Venson was booked into jail and appeared by video before a judge who informed him that he was charged with both possession of a controlled substance and solicitation of unlawful business. Nineteen days after he was arrested, a preliminary hearing was conducted. After hearing testimony from Altamirano, a judge dismissed the charges for want of probable cause, and Venson was released.

Venson filed this suit against the three officers one year later. His claims of false arrest, illegal search, and malicious prosecution were tried to a jury over the course of three days. Venson and the three officers all testified. As we noted at the outset, the jury returned a verdict in favor of the officers. Venson now challenges the district court's denial of his multiple motions challenging the adverse verdict.

## II.

After the jury found against him, Venson filed three separate motions attacking the trial and the verdict: a motion for judgment notwithstanding the verdict pursuant to Rule 50(b)(3) of the Federal Rules of Civil Procedure, a motion for judgment as a matter of law pursuant to Rule 60(b)(3), and a Rule 59(a)(1) motion for a new trial. The motions raised a plethora of issues regarding the plausibility of the defendants' testimony, the conduct of defense counsel, and multiple evidentiary rulings. The district court denied each of the motions in a written opinion. R. 142. Venson's appeal pursues nearly all of the challenges to the trial and verdict that the district court rejected. We take each of his post-trial motions in turn.

A. Rule 50(b)(3) judgment as a matter of law

Venson contends that the district court erred in denying his motion for judgment as a matter of law; our review of the district court's decision on this question is de novo. *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 834–35 (7th Cir. 2013). Our task is to consider whether the evidence, viewed in the light most favorable to the defendants, is sufficient to support the verdict in their favor. *Id.* at 835. Only if no rational jury could have found for the defendants will we reverse. *Id.*

1. Credibility issues.

Although credibility assessments are beyond our purview, *see id.*, Venson's opening contention is that the defendant officers' testimony that they heard him crying out "rocks, rocks" from 300 feet away—including Altamirano's testimony

that he could see Venson's mouth moving and forming those words—was inherently incredible, and that for this reason the jury's verdict in their favor cannot be sustained. Venson makes no serious argument that the laws of nature make it physically impossible for the officers to have heard him at a distance of 300 feet. *See, e.g., United States v. $304,980.00 in U.S. Currency*, 732 F.3d 812, 816 n.1 (7th Cir. 2013); *Whitehead v. Bond*, 680 F.3d 919, 925–26 (7th Cir. 2012). He presented no objective evidence—no testimony from an audiologist or comparable expert, for example—supporting such a proposition. His argument instead really hinges on the premise that it was "exceedingly improbable" that the officers would have been able to hear him. *See United States v. Cardona-Rivera*, 904 F.2d 1149, 1152 (7th Cir. 1990) (in swearing contest, factfinder's choice of whom to believe is conclusive unless it rests on exceedingly improbable testimony, which includes testimony that is "'internally inconsistent or implausible on its face'") (quoting *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 575, 105 S. Ct. 1504, 1512 (1985)); *see also, e.g., United States v. Johnson*, 729 F.3d 710, 715 (7th Cir. 2013). We understand this to be an argument that although it was not necessarily impossible for the officers to have heard him (and to see his mouth moving) at this distance, the likelihood is so remote that we should disregard it. Were we to agree, this would suggest that the officers had no basis to accost and detain Venson in the first instance.

But what Venson is really doing is rearguing his case to the jury on this point; he has given us no ground on which to hold that the officers' testimony on this point is so implausible that the jury could not rationally believe it. In the words of *Cardona-*

*Rivera*, their account, even if improbable, is not exceedingly so. 904 F.2d at 1152. First, although Venson testified, and now emphasizes, that he was facing away from the officers, the officers said that he was only partially so—by their account, they were facing west, and he was facing southwest. They also insisted that he was shouting at the top of his voice. Second, although the officers were in an enclosed car and it was November, Altamirano, who was driving, testified that he always kept the window cracked open at the least, and that it was possible the window may have been open more than that. Third, although Venson suggests that traffic noise would have drowned out the sound of his voice, this was a predominantly residential neighborhood, and O'Keefe and Altamirano said that they saw only one car in the immediate vicinity at the time and Altamirano testified that the traffic noise was "normal." Tr. 148. We note that the jury had a reference point for the distance at which the officers claimed to have heard Venson: the district court took judicial notice that the hallway outside of the courtroom was 325 feet long. And the jury also had a picture of Venson taken from a distance of 300 feet (Plaintiff's Ex. 3, R. 111-3) against which they could assess the officers' testimony that they had seen his lips moving. In short, the credibility of the officers' testimony that it was Venson they heard yelling "rocks, rocks" was for the jury, not us, to assess.

Venson also suggests it was highly unlikely that anyone would be shouting the term "rocks," as the illicit connotation of the term would be an invitation to arrest him. But Venson himself at one point conceded—in one of the more odd exchanges during the trial—that he had heard the term used on the street in his neighborhood, although he qualified and then

denied that he had ever heard the term shouted from a street corner in a narcotics-related sense. R. 150 at 88–89. And although Venson insists that it is highly unlikely he or anyone else would be shouting it when no pedestrians were present to hear it, both Altamirano and O'Keefe testified that they saw a car driving through the intersection as Venson was yelling, so it is possible that Venson was directing his message to the occupant or occupants of that vehicle—indeed, that was Altamirano's testimony. Tr. 151. And we have no reason to believe that a street dealer attempting to find customers would not hawk his wares loudly enough to be heard 300 feet away, as the officers testified Venson did.

Venson proceeds to argue that if he was dealing crack cocaine, he would not have walked *toward* the officers as they drove their car up the street toward him. (The parties appear to agree that Venson recognized the unmarked Crown Victoria as a police vehicle.) But not all criminal suspects react to the unexpected arrival of the police in the same way: some flee, some feign innocence or nonchalance (as O'Keefe testified), and some engage the officers aggressively—the possibilities are as diverse as the range of human behavior, which is not always rational. For the same reason, we cannot say that it was exceedingly improbable that Venson would have held onto the baggie of cocaine as he approached the officers, only to drop it when he was within a few feet of them.

Venson takes note of a helpful discrepancy in Jania's testimony regarding the baggie that he said Venson dropped to the ground after the officers indicated they wished to speak with him: Jania testified that Venson dropped the baggie from his right hand, but apparently when asked to demonstrate

Venson's actions for the jury indicated Venson had dropped if from his left hand. *See* Tr. 228. (Jania may have simply mis-spoken: earlier he appeared to agree that he saw Venson drop the bag from his left hand. *See* Tr. 211.) But this is the sort of ordinary inconsistency that occurs during the testimony of witnesses whose memory or nerves may fail them. It certainly was fair game in arguing Jania's credibility to the jury—and Venson's counsel did point it out. Tr. 355. But it did not render Jania's testimony so implausible that the jury could not choose to believe him.

Finally, Venson suggests it is highly implausible that, if he were dealing in narcotics, he would only have one small baggie on him. Jania, however, testified that dealers often keep only small amounts on their persons in case they are caught by the police. Tr. 233–34. His testimony is consistent with what we have sometimes seen in cases involving the distribution of narcotics by street gangs: the individual who engages in hand-to-hand transactions with customers does not necessarily carry a large quantity of narcotics on his person; supplies may be kept elsewhere, possibly under the care of a separate individ-ual, in order to lessen the odds that the dealer will be caught red-handed by the police or robbed by a customer or competi-tor. *See, e.g.*, *Monroe v. Davis*, 712 F.3d 1106, 1108–09 (7th Cir. 2013).

Venson identifies a separate issue with Altamirano's credibility that he contends the district court failed to consider: the "fact" that Altamirano twice lied under oath. Venson Brief 19. The notion that Altamirano lied is Venson's view of what occurred; but the record does not compel that conclusion, and the district judge certainly never found that Altamirano lied. In

the first instance, Altamirano wrote in the misdemeanor complaint that Venson had been arrested for soliciting to sell drugs to "by yelling 'rocks, rocks' to passing vehicle and pedestrian traffic," R. 111-9, but at trial, Altamirano testified that no pedestrians were in fact present at the time the officers encountered Venson, Tr. 151. When the discrepancy was called to Altamirano's attention, he explained that he had used the term "pedestrian" in the complaint to generically mean "citizen" (which included someone in a vehicle) rather than someone walking on the sidewalk, Tr. 153–54. In the second instance, Altamirano testified at trial that he did not see Venson drop anything; but the transcript of the preliminary hearing in state court reflects the following testimony by Altamirano on that point: "As I approached, observed him drop an item to the ground which was recovered by my partner." R. 111–10 at 3–4; Tr. 166. When confronted with this discrepancy, Altamirano indicated that the pronoun "we" was missing from his testimony as transcribed, and that what he had actually said (or meant to say) in state court was, "As I approached, *we* observed him drop an item to the ground which was recovered by my partner." Tr. 167–68, 189–90 (emphasis ours). Although we agree with Venson that Altamirano's explanation of the first discrepancy was somewhat "lame," Venson Br. 19, neither explanation was so injurious to Altamirano's credibility that the jury was compelled to discard or discredit his testimony altogether. Obviously, Venson's counsel was able to and did remind the jury of both discrepancies. Tr. 345–58, 383–84.

Conversely, we cannot say that Venson's credibility was so unscathed as to essentially compel the jury to credit his version

of events over that of the defendants. His account, it is true, does not present any questions as to what was possible or plausible given the laws of nature, but it did require the jury to believe that the defendants decided to frame him notwithstanding his innocence of any criminal conduct. A jury could have believed that, but in fact this jury did not. The relevant point, again, is that the credibility of the parties' competing accounts was for the jury to assess. In that regard, we would note that the district judge, who like the jurors heard the testimony first-hand, noted that there were certain "red flags" raised by Venson's testimony. R. 142 at 15–16. For example, Venson testified that he believed the officers ran his name through the computer in their car; but records indicated either that the car assigned to the officers that day did not have a computer or that they had not logged on to use it. Tr. 299–300. And, notably, Venson at first would not answer whether he had ever heard the term "rocks" yelled in his neighborhood, then, after the district court instructed him to answer the question, briefly allowed that he had, then said he was not sure, and ultimately said that he had only heard a far more innocent (if implausible) usage of the term: "Go ahead, go rock Cubs" or "[r]ock Bears." Tr. 88.

All of these points were relevant to the credibility of the officers' account and were appropriately raised in the closing arguments that Venson's attorney made to the jury. But none exposes a flaw in the officers' testimony so out-of-the ordinary and significant as to remove the assessment of their credibility from jury.

2.  Probable cause to arrest

Venson contends that the officers lacked probable cause to arrest him. Probable cause to make an arrest exists when a reasonable person confronted with the sum total of the facts known to the officer at the time of the arrest would conclude that the person arrested has committed, is committing, or is about to commit a crime. *E.g.*, *Gutierrez v. Kermon*, 722 F.3d 1003, 1008 (7th Cir. 2013). Venson divides his encounter with the defendants into two stages: stage one, when the offers approached and commanded him to "come here" or "hold up" after the officers purportedly heard him yell "rocks, rocks," which he characterizes as an arrest for the solicitation of unlawful business; and stage two, when, after the officers said Venson dropped the baggie of suspected cocaine, they hand-cuffed him and took him into custody on the additional charge that he was in possession of a controlled substance. Venson contends that at stage one, the officers, even crediting their account, lacked probable cause to make an arrest based solely on his conduct in yelling "rocks, rocks" on a street corner. His argument as to stage two represents a renewed attack on the credibility of the officers' testimony that he dropped a baggie containing what looked to be crack cocaine.

The defendants quarrel with Venson's characterization of the encounter as a two-stage arrest or two arrests, asserting that the encounter began as an investigatory detention, *see Terry v. Ohio*, 392 U.S. 1, 21–22, 30, 88 S. Ct. 1868, 1880, 1884–85 (1968), and ripened into an arrest only after they saw Venson drop the baggie and then placed him in handcuffs. The district court reached the same conclusion: the encounter began as a *Terry* stop requiring only a reasonable suspicion that criminal

activity might be afoot, *see id.* at 21–22, 88 S. Ct. at 1880, which
Venson's cry of "rocks, rocks" supplied, and progressed to an
arrest only after Venson dropped the baggie, at which point the
officers had probable cause to make an arrest. R. 142 at 6–8.

We have no reason to question the district court's applica-
tion of *Terry* to the facts, but the one wrinkle is Venson's
observation that *Terry* and the concept of an investigatory stop
was never raised at trial. Our review of the record bears out
that assertion. Altamirano testified that when the officers first
approached Venson, their intent was to detain and investigate,
Tr. 162, which is language consistent with a *Terry* stop rather
than an arrest. But we have found no other reference in the
questioning, arguments, or jury instructions to the nature of an
investigatory detention, the distinction between such a
detention and an arrest, or at what point a *Terry* stop becomes
an arrest. We agree with the district court that the jury plausi-
bly could have found that Venson was not yet under arrest
when he was told to "hold up" or "come here," R. 142 at 7; but
the parties seem to have operated on Venson's premise that he
was arrested at the outset of the encounter. Jania testified, for
example that the decision to arrest Venson was made based on
his yelling "rocks, rocks." Tr. 207. And in his closing argument,
defendants' counsel argued that the officers had probable
cause to arrest Venson based on having heard him yelling
"rocks, rocks" at the street corner. Tr. 373.

But even if we assume, consistent with Venson's character-
ization, that the officers arrested him at the outset of the
encounter when they demanded that he "come here" or "hold
up," the Illinois Supreme Court's decision in *People v. Grant*,
983 N.E.2d 1009 (Ill. 2013), makes clear that the officers had

probable cause to arrest him at that point in the encounter based on what they had already observed. The court held in *Grant* that officers had probable cause to believe that the defendant was soliciting unlawful business in violation of Chicago Municipal Code section 10-8-515 after they heard him yelling "dro, dro"—which they understood to be a street term for hydroponically-grown marijuana—to a passing vehicle in an area known for drug dealing. 983 N.E.2d at 1013. The facts here are comparable: The officers heard Venson yelling "rocks, rocks"—which they knew to be a term for crack cocaine—while a car was passing through the intersection where he was standing. It appeared to Altamirano that Venson was addressing himself to the occupants of the car. Tr. 151. Confronted with those facts, a person could reasonably believe that Venson was soliciting passers-by to purchase cocaine from him. It was not necessary that officers hear Venson repeat the solicitation, 983 N.E.2d at 1013–14, or that they discover drugs in his possession or witness him complete a transaction, *id.* at 1014–15, in order to conclude that he was violating the unlawful solicitation ordinance.

The existence of probable cause at this stage of the encounter moots Venson's remaining arguments. We note, however, that those additional arguments are premised on the notion that a jury could not credit the testimony of O'Keefe and Jania that Venson dropped the baggie as he complied with their command to "come here" (as we noted earlier, Venson insists that it is implausible that he would walk half a block toward the officers and not drop the baggie until he was a few feet away from the officers). We have already rejected the notion that the jury could not credit the officers' account in this

respect. The discovery of the baggie, coupled with the behavior the officers had already observed, supplied ample probable cause to believe that Venson had possessed a controlled substance, in violation of the Illinois criminal code, in addition to soliciting unlawful business. As we have already emphasized, the credibility of the officers' testimony was for the jury to evaluate, and nothing prevented the jury from finding them truthful. With probable cause to arrest Venson, the officers were entitled to conduct a search of his person (including, for example, his pockets) incident to arrest. *United States v. Robinson*, 414 U.S. 218, 235, 94 S. Ct. 467, 477 (1973).[1]

3.   Malicious prosecution claim

Venson has also renewed his argument for judgment as a matter of law on his malicious prosecution claim, but the premise of this argument is that there was no probable cause to believe that he solicited unlawful business, in violation of the Chicago Municipal Code, or that he possessed a controlled substance, in violation of the Illinois Criminal Code. As the foregoing discussion makes clear, there was probable cause to believe Venson had committed both offenses. As a matter of law, probable cause defeats a claim for malicious prosecution. *E.g.*, *Matthews v. City of E. St. Louis*, 675 F.3d 703, 709 (7th Cir. 2012).

---

[1]   The jury plainly rejected Venson's testimony that the officers exceeded the bounds of a legitimate search incident to arrest by searching inside of his underwear and around his genitals and buttocks.

B. Motion for relief under Rule 60(b)(3)

The second focus of Venson's appeal is the district court's denial of his Rule 60(b)(3) motion. Rule 60(b)(3) provides that the court may grant a party relief from the judgment where there was "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party." It is an "extraordinary remedy" reserved for "exceptional circumstances." *Wickens v. Shell Oil Co.*, 620 F.3d 747, 759 (7th Cir. 2010). The party seeking relief pursuant to Rule 60(b)(3) must show that he had a meritorious claim that he could not fully and fairly present at trial due to his opponent's fraud, misrepresentation, or misconduct. *Id.* We review the district court's decision to deny relief under Rule 60(b)(3) for abuse of discretion. *Id.* at 758.

1. Questions regarding collection and submission to inventory of suspect cocaine

Venson's opening contention is that defense counsel engaged in "flagrantly improper conduct" by engaging in certain lines of inquiry that he believes were foreclosed to the defense by the district court's rulings on the parties' motions *in limine*. Venson Br. 30. As relevant here, the court had (1) barred all evidence regarding the Chicago Police Department's inventory report and photographs of the baggie that Venson had dropped to the ground, the submission of the contents of that baggie for testing, and the results of that testing (including the notes and report generated by the Illinois State Laboratory and any testimony by the forensic scientist who performed the testing or the prosecutor who handled Venson's case); (2) denied the defendants' request to take custody of the baggie

and its contents, on the ground that the defense had not disclosed any expert witnesses on the subject of what the baggie contained and that the court would not allow non-expert testimony that the substance was in fact crack cocaine; (3) barred any reference to the area of Venson's arrest as a high-crime area or locus of frequent drug-trafficking.

The first of two sets of questions Venson believes amounted to willful violations of these rulings were questions that defense counsel posed to Altamirano, asking him (a) to indicate whether he had made other drug arrests in the area of Venson's arrest, Tr. 175–76, and (b) to recount that he had been in that same area in the week prior to trial with defense counsel and had heard someone yell out at an intersection one city block from where he was standing and was able to hear it, Tr. 178–79. Venson's objections to both inquiries were sustained.

The second set of questions that Venson labels as misconduct is a line of inquiry regarding how Jania handled the discovery of the baggie of suspect cocaine that Venson dropped. Counsel essentially asked Jania to describe what he did (and why) when he saw Venson drop the baggie. In response to those questions, Jania indicated that upon picking up the baggie, he observed that it contained a "white, rock-like substance, suspect crack cocaine"; that he communicated his impression to the other two officers by uttering the code "57," in order to "let[ ] them know that [he] [had] recovered narcotics" in a discreet way that would avoid antagonizing and/or prompting an effort to flee by Venson; and that he initiated the inventory process for the baggie and its contents. Tr. 226, 228–29, 243–45. Venson points out that the district judge

sustained his objections when the questioning turned to what happened with suspected narcotics when they are delivered to the police station. The judge reminded defense counsel that he had barred any evidence concerning inventoried narcotics and admonished him forcefully and at length for violating those rulings, describing counsel's conduct in that regard as "a cheap thing to do, sir." Tr. 246.

The district court, which was in the best position to assess counsel's conduct, stated it that did "not believe that defense counsel willfully violated its pre-trial orders," R. 142 at 9, and we have no reason to question that assessment. With respect to the first line of inquiry, it is not obvious to us that any of the district court's pretrial rulings necessarily precluded defense counsel from asking Altamirano whether he had made other drug arrests in the area of Venson's arrest and whether he was able to hear someone yelling out in that area shortly before trial. Indeed, the court itself allowed Altamirano to testify, for example, that he had heard the term "rocks" used in that neighborhood many times both before and after Venson's arrest. Tr. 176; *see also* Tr. 79 (court allowed defense to cross-examine Venson on this same subject). We can think of multiple reasons why the court sustained Venson's objections to these two questions; but it is noteworthy that the court did not cite its pretrial rulings on the motions *in limine* in so ruling (nor did plaintiff's counsel cite those rulings in objecting). As to the second line of inquiry, again it is not obvious that the court's pretrial rulings precluded *any* reference to the inventorying process, including the fact that there was such a process, what steps Jania took at the scene to initiate that process with the dropped baggie, and what would ordinarily occur at the

police station when evidence was delivered there for safekeeping. Defense counsel may have ventured into a gray area when he broached the latter subject, but like the district court we see no evidence that his inquiry amounted to a willful attempt to breach or circumvent the court's prior orders. Venson's counsel herself made the inventory process relevant when she suggested multiple times in questioning that the officers had access to controlled substances by virtue of their work and thus implied that they might have planted the drugs at the scene in order to falsely implicate Venson in drug dealing. Tr. 236–37; 255–56. She pursued the same point in her closing argument. Tr. 356.

As we have noted, in order to obtain relief under Rule 60(b)(3), the movant must show not only that misconduct occurred, but that it prevented him from fully and fairly presenting his case; and, as the district court also concluded, Venson has not shown this. In each instance, the court not only prevented the defense from moving into a problematic area by sustaining Venson's objections, but, in the second instance, it offered to entertain a curative instruction, Tr. 246, an invitation that Venson never pursued. Venson has not otherwise shown how the questioning affected the presentation of his case.

2.  Undisclosed expert testimony by the officers

Each of the defendants was asked certain questions about how, in their experience, drug dealers behave; these questions, it is fair to say, were aimed at rebutting Venson's attack on the plausibility of the officers' testimony as to what had occurred on the day of his arrest. Thus, Jania testified that it is not uncommon for drug dealers to keep only limited quantities of

narcotics on their person in order to limit their criminal exposure if arrested. Tr. 233–34.

> In my opinion, the people that we deal with [who] have narcotics, they've been selling narcotics and they know from previous arrests that the more narcotics they have on them, the wors[e] it is for them. So they will keep a smaller amount on them when they're selling.

Tr. 233. Altamirano testified that he had heard other persons not simply say but yell "rocks" in the neighborhood in which Venson was arrested hundreds of times—and when asked by defense counsel to focus on the number of times he had heard it during the period after Venson's arrest and prior to trial, he put the number at roughly 50 to 60. Tr. 175–78. And O'Keefe testified that in his experience it "wouldn't be that strange" for a person he had heard or seen selling drugs to walk toward rather than away from him as a means of pretending that he was not doing anything illegal. Tr. 283–84. "I've even seen individuals that have been involved in shootings walk away from the scene pretending that they had nothing to do with it." Tr. 284. Venson posits that in all three instances this amounted to expert testimony by the officers as to the typical behavior of drug dealers, for which no foundation had been laid, which did not meet the criteria set forth in Federal Rule of Evidence 702, which had not been disclosed in advance as required by Federal Rule of Civil Procedure 26(a)(2). Venson thus argues that defense counsel's conduct in eliciting this testimony amounted to misconduct warranting relief under Rule 60(b)(3). We reject this argument for a number of reasons.

First, the argument has been preserved only as to Jania's testimony; only in that instance did Venson's counsel object on the ground that the witness was being asked to give expert opinion. Tr. 233 (counsel objects to questions asked of Jania on ground that "[h]e's becoming an expert"). Venson contends that although he neither expressly invoked Rules 702 or 26(a)(2) nor used the term "expert" in objecting to the testimony by Altamirano and O'Keefe, his counsel did object in terms that track the provisions of those rules. We disagree. Venson's counsel objected to the questions posed to Altamirano on grounds including "[v]ague and confusing," "[n]o foundation," "no time period," and "overbroad," Tr. 175–78, and to the questions posed to O'Keefe on grounds including "[s]peculative," and "too overbroad," Tr. 283. Generic objections of this sort certainly could be made to the testimony of a putative expert, and we agree with Venson that they overlap with and inform the requirements of Rules 702. But they are neither unique to expert testimony nor so evocative of these two rules as to have placed the district court on notice that counsel was making an objection founded on these rules. The argument, insofar as it concerns the testimony of Altamirano and O'Keefe, has been waived.

Second, as a matter of logic, it is hard to make the case that any of these lines of inquiry amounts to misconduct given that the district court overruled the defense objections in each instance, including the one instance in which Venson objected to the questions as calling for expert testimony. Of course, we cannot know what was in defense counsel's mind, but we see no evidence in the record, and the district court plainly saw none, that defense counsel was attempting to deceive either

Venson's counsel or the court as to the testimony he meant to elicit or to evade the requirements of Rules 702 and 26(a)(2). Questions as to when a police officer is testifying as a fact witness or an opinion witness, and when the opinions he gives on the witness stand are those of a lay witness governed by Federal Rule of Evidence 701 or an expert witness governed by Rule 702 are context-specific and the correct labels are not always obvious, even in retrospect. *See*, *e.g.*, *United States v. Colon Osorio*, 360 F.3d 48, 52–53 (1st Cir. 2004). Consequently, it would not necessarily have been clear to defense counsel (or for that matter, Venson's counsel) whether and when the questioning ventured into the realm of Rule 702. Here, each line of inquiry was responsive to suggestions of implausibility that Venson's counsel had raised: Would someone really yell "rocks, rocks" at the top of his lungs on a public street corner? Would a street dealer have only one small baggie of crack cocaine on his person? Would such an individual turn and approach rather than run away when suddenly confronted by police officers? And each of the questions posed by defense counsel in addressing these points was framed in terms of the individual witness's own experience. *See*, *e.g.*, *Clarett v. Roberts*, 657 F.3d 664, 671 (7th Cir. 2011) (officer permissibly testified based on his own experience and training as to plausibility of Taser having discharged as many times and as frequently as printout from its internal memory indicated). We take Venson's point that the questions indeed may, in the end, have called for expert opinion subject to the requirements of Rules 702 and 26(a)(2). But on this record it is difficult to discern misconduct, as opposed to simple mistake, on the part of

defense counsel in asking questions that the district court itself, over objection, allowed.

Third, of the three lines of inquiry, only the questions asked of Jania potentially pose a substantial Rule 702 problem. Altamirano's testimony as to the number of times he has heard the word "rocks" uttered in the area of Venson's arrest, and whether it was shouted or merely spoken, was based solely on his own experience and observation; he was not asked to opine on how a typical drug dealer would behave. There might be other objections to Altamirano's testimony, which we address in a moment. But the notion that he was testifying as an expert—even if not waived—goes nowhere. O'Keefe's testimony as to why someone engaged in criminal activity might walk toward rather than away from an approaching police officer came closer to the realm of expert testimony. It was couched in terms of his own experience, and it was relevant both in the sense of what inferences he and his fellow officers reasonably could have drawn in light of that experience as to Venson's behavior, *see United States v. Bullock*, 632 F.3d 1004, 1022 (7th Cir. 2011) (in determining whether suspicious circumstances rise to level of probable cause to make arrest, officer may make reasonable inferences based on his experience and training); *United States v. Flood*, 965 F.2d 505, 510–11 (7th Cir. 1992) ("In establishing that probable cause existed for an arrest or a search, law-enforcement officers commonly testify that their experience indicates a certain behavior pattern or a particular combination of circumstances is indicative of—as opposed to proof of—criminal activity."), and to meet Venson's point that the behavior they attributed to him was implausible. Yet, O'Keefe's testimony as to what was usual (or

not unusual) in his specialized experience and knowledge spoke to how a typical criminal might behave and to that extent perhaps suggested to the jury how they should evaluate Venson's actions, notwithstanding O'Keefe's disclaimer that he could not speak to why Venson behaved as he did. Tr. 283. *See Tribble v. Evangelides*, 670 F.3d 753, 758 (7th Cir. 2012) (prosecutor who was asked to summarize her experience in particular type of courtroom and to draw conclusions about how it operated was testifying as an expert whose opinion was meant to guide jury in drawing inferences as to significance of what occurred in plaintiff's case); *see also United States v. Christian*, 673 F.3d 702, 709–10 (7th Cir. 2012) (officer asked to bring to bear his experience on defendant's observed behavior and make connections for jury is testifying as expert). That point aside, although O'Keefe was speaking from a wealth of experience with people engaged in criminal conduct, the point he was making was hardly one that only a law enforcement official would appreciate. Most people have had experience with catching someone (or being caught) in the act of doing something discouraged or out-of-bounds, if not illegal, and could judge for themselves how likely it was that Venson, if indeed engaged in drug-dealing, would have walked toward the officers' car in order to feign innocence rather than attempting to flee.

Fourth, like the district judge, we are not convinced that Jania's testimony, even if it did fall into the category of expert testimony (and defense counsel's supposed misconduct in eliciting it), was prejudicial in the sense that it prevented Venson from fully and fairly presenting his case. We may assume that Jania was giving expert opinion when he testified

that street drug dealers will often carry only limited quantities of narcotics on their persons in order to limit the penalties they would face if they were caught by the police in the act of distributing drugs. Although Jania, like the other two officers, was speaking from his own experience—and counsel clarified that Jania, like O'Keefe, was not speaking to Venson's conduct, Tr. 234—this aspect of his testimony arguably reflected specialized knowledge about the interaction of criminal behavior on the street with the judicial system and statutory sentencing provisions. To this extent, his testimony spoke to points that were likely beyond the knowledge of ordinary lay people. Moreover, notwithstanding the disclaimer that Jania was not speaking about Venson, it was arguably intended to suggest to the jury that they should interpret the discovery of only one baggie of suspected crack cocaine in Venson's possession as inculpatory rather than exculpatory. *See Christian*, 673 F.3d at 710; *Tribble*, 670 F.3d at 758–59. The district court itself thought that Jania's testimony in this respect bore indicia of expert as well as lay opinion. R. 142 at 12. But insofar as Jania may have been testifying as an expert, he made just one discrete point; in overruling Venson's objection, the court allowed him to give only one answer to one question. Although Jania's opinion suggested one possible explanation for the discovery of a single baggie, we have no reason to believe the jury would have given that possibility more weight than any other explanation, including the one that Venson's counsel promoted: that the drugs were planted. Jania's testimony was not offered to the jury as expert opinion, *see* R. 142 at 12 (citing *Clarett*, 657 F.3d at 671). The jury might have decided to credit Jania on this point; but in evaluating Jania's opinion, it would

have understood that his testimony, like that of his co-defendants, was self-serving in the sense that it was meant (notwithstanding the disclaimer) to put an incriminating spin on Venson's behavior and thus to defeat his contention that the officers had arrested him without probable cause.

One final point before we move on: On the matter of Altamirano's testimony that he had heard the term "rocks" shouted on Lawndale street corners hundreds of times, Venson argues that defense counsel wrongly focused on the period of time post-dating Venson's arrest (during which period Altamirano said that he had heard it on 50 to 60 occasions). We are not sure why defense counsel focused on that particular period of time. Both periods of time were relevant to the extent they addressed the plaintiff's contention that it was implausible that anyone would stand on a street corner shouting "rocks, rocks"; but the time period pre-dating Venson's arrest was arguably more relevant to the extent it addressed how Altamirano and his colleagues would have perceived Venson's behavior at the time of his arrest. In any case, as we have discussed, Altamirano was discussing his own experience and observations, and in that sense he was doing no more than Venson himself did when he was asked whether he had ever heard "rocks" yelled out in his neighborhood. Again, the jury surely appreciated that both witnesses were self-interested in the testimony they gave on this point. We also note that Venson's counsel chose to revisit the subject and cross-examine Altamirano on the matter of his having heard the term used in Venson's neighborhood in the period after his arrest. Tr. 194. We do not see how Altamirano's testimony on this point prevented Venson from making his case.

C.  Motion for New Trial

Finally, Venson argues that the district court erred in denying his motion for a new trial pursuant to Rule 59(a)(1)(A). A new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party. *E.g.*, *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012). We review the district court's decision to deny the request for a new trial for abuse of discretion. *E.g.*, *Reynolds v. Tangherlini*, 737 F.3d 1093, 1105–06 (7th Cir. 2013).

1.  Misconduct by defense counsel

Venson's opening contention is that various instances of misconduct by the defendants' counsel entitle him to a new trial. We have dealt with most of the cited examples of purported misconduct in our discussion of Venson's Rule 60(b)(3) motion and will not repeat our analysis here. Instead, we will confine our discussion to two arguments not raised in connection with the Rule 60(b)(3) motion.

During closing argument, defense counsel referred to the area in which Venson was arrested as an "open-air drug market." Tr. 372.[2] Venson contends that this reference was a violation of the district court's pretrial ruling granting his motion *in limine* number 4 to bar reference to the area as a high crime or drug area. Venson waived this argument by not making an objection at the time; indeed, we do not see that it

---

[2]   Specifically, counsel argued, "It happens all the time. It's an open-air drug market, and the only way the buyers know what you're selling, know about what you're selling is if you actually tell them." Tr. 372.

was even mentioned in Venson's motion for a new trial. *See* R. 127. Waiver aside, improper remarks made during closing arguments rarely are so serious as to constitute reversible error. *See*, *e.g.*, *Smith v. Hunt*, 707 F.3d 803, 812 (2013). Here, counsel was making the point that a street dealer would yell out to his potential customers, as the defendants had testified that Venson did. Even assuming that the use of the term "open-air drug market" was inconsistent with the court's pretrial ruling, we cannot see how the single reference prejudiced Venson: Venson's counsel was able to and did deal effectively with her opponent's choice of words in her rebuttal argument. Tr. 382.

Venson also argues that defense counsel, when questioning certain witnesses, ran afoul of the court's pretrial ruling barring reference to the inventorying and testing of the seized baggie and its contents by referring to the "narcotics" and thereby implying that the tests had confirmed the baggie contained narcotics. No objection on this ground was made at the time; and any error that occurred in this regard was surely harmless. The references were most likely mere shorthand, and in any case were isolated. As the defendants point out, plaintiff's counsel herself, in questioning Jania, remarked that he was the only one of the three officers who had seen Venson drop "the drugs." Tr. 220.

### 2. Evidentiary errors

We may make short work of Venson's contention that various evidentiary rulings deprived him of a fair trial, as we have already touched upon each of the rulings that he cites as error on the part of the district court. First, Venson contends

that the court was mistaken to permit the defendants to testify, based on their experience in the field, about the ways in which drug dealers behave. In Venson's view, this amounted to improper expert testimony, and apart from that was irrelevant, speculative, and prejudicial. But as we have indicated, the testimony of which Venson complains was limited, was based on the officers' own experiences, was subject to cross-examination, was arguably relevant both to illuminate why the officers believed that Venson was committing a crime and to address Venson's central argument that the behavior the officers attributed to him was entirely implausible. And if some of the testimony amounted to improperly admitted expert opinion, it was harmless for the reasons we have already discussed.

Venson also argues that the court erred in allowing the defense to question him as to whether he had ever heard the term "rocks" used on the streets of his neighborhood, with the result that counsel harassed and badgered a silly answer from him. However, we see no abuse of discretion in the district court's ruling—that the plaintiff's theory that it was incredible that he or anyone else would have shouted this term, which theory was argued from the very start of the case—opened the door to this line of questioning. Tr. 79. Any contention that Venson was forced into his awkward testimony that he had heard "go rock Cubs" and the like goes nowhere.

Finally, the notion that Venson was prejudiced when the court allowed the defense to elicit testimony from Altamirano that he was "dishearten[ed]" and "hurt[ ]" at having been sued, Tr. 175, has no merit. Whatever its relevance, the testimony was hardly revelatory or surprising, let alone prejudicial to the plaintiff's case.

### 3.   Verdict against the manifest weight of the evidence

We have already dealt with Venson's contention that the verdict was against the manifest weight of the evidence in addressing his motion for judgment as a matter of law. This was a swearing contest, and nothing precluded the jury from crediting the defendants' account of what occurred. Their testimony is sufficient to support the verdict.

### 4.   Cumulative Error

The notion that some combination of the errors asserted above deprived Venson of a fair trial is no more meritorious than the individual claims of error. The district court was careful to limit the scope of the evidence presented and to give both parties a fair trial.

## III.

For all of the reasons we have discussed, the district court did not abuse its discretion or otherwise err in denying the plaintiff's motions for judgment notwithstanding the verdict, for relief from the judgment, or for a new trial.

AFFIRMED